[No. F016752. Fifth Dist. Nov. 3, 1993.]

In re LEO M. et al., Persons Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
OLGA V., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, IV and V.

1584

## COUNSEL

Catherine Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, County Counsel, and Susan M. Gill, Deputy County Counsel, for Plaintiff and Respondent.

Donna L. Hall, under appointment by the Court of Appeal, for Minors.

## OPINION

**ARDAIZ, J.**—This appeal involves a decision of the juvenile court terminating appellant's parental rights as to Leo M. and Angel G. Insofar as only the mother has appealed, the statement of the case, as well as the facts, will include only those items relevant to her claim.

On December 6, 1989, a petition was filed against appellant in Kern County Superior Court alleging that Leo M., then three years of age, came within the provisions of subdivisions (b), (g), and (j) of Welfare and Institutions Code section 300.[1] A similar petition was filed at the same time on behalf of Leo's half-sister, Angel G., who was then six months of age. On December 7, 1989, after appellant entered her denial as to both petitions, the court detained the minors and ordered that they be placed in either shelter care or a foster home pending evaluation of placement with relatives.

During the jurisdictional hearing on January 31, 1990, appellant admitted count I, allegation 1 (history of drug use) and count II, allegation 3 (paternal physical and sexual abuse of sibling) of the allegations contained in an amended complaint concerning Leo M.[2] The remaining allegations contained in that petition were dismissed. As to the allegations involving Angel, appellant admitted only those contained in count II, allegation 1 (history of drug use).

On March 30, 1990, a single dispositional hearing was held regarding both petitions. Appellant was incarcerated at the time but, by choice, did not attend the hearing. Placement, as to both minors, was continued outside the home and appellant was ordered to participate in the following reunification services: (1) counseling for family violence, substance abuse, child neglect; (2) parent training; (3) drug testing with negative test results on five consecutive occasions prior to the children being returned; and (4) two supervised visits per month each of two hours' duration. The court also ordered that the minors be allowed visits with their paternal grandparents and be tested for HIV antibodies. Finally, the court indicated that the minors were either to be returned to their parents or placed for adoption or legal guardianship by June 4, 1991.

The six-month review hearing was held on September 28, 1990. Appellant attended this hearing despite the fact that she remained in custody. At the conclusion of the hearing, the court found that there had been no compliance

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The amended petition deleted the allegations concerning section 300, subdivision (g).

with the case plan even though reasonable services had been offered to appellant. The court advised appellant that, in the event the minors were not returned by the next review hearing, a permanent plan would be developed at that time.

A contested 12-month review hearing was held on April 25, 1991. Appellant remained in custody but attended this hearing as well. Testimony was taken from the family reunification counselor assigned to appellant's case since September of 1990 and certain documents related to appellant's attempts at compliance with the reunification plan were admitted into evidence.

According to the counselor, appellant completed phases one and two of the Breaking Barriers program but, in August of 1990, quit attending the Alcoholics Anonymous (AA) meetings offered at the prison. At first, appellant claimed that she was unable to attend the AA meetings due to a conflict in her work schedule. Later, she admitted that the meetings were held after normal working hours but claimed to be too tired to attend the meetings held only once per week. The social worker testified that, had appellant asked, she would have been allowed to change her work schedule so that she could have attended the meetings.

After considering the evidence and arguments of the parties, the court made the following findings: a return of the minors to the physical custody of either parent would create substantial risk of detriment to their physical or emotional well-being; the minors' current placement is appropriate and necessary; and further, that there had been minimal compliance with the case plan for each minor despite the fact that reasonable services had been provided. The court went on to find, by clear and convincing evidence, that the parents failed to participate regularly in court-ordered treatment and that there existed no substantial probability that the minors would be returned to the care of appellant within six months. Accordingly, the court terminated reunification services and ordered a section 366.26 hearing to be held within 120 days.

On August 30, 1991, appellant filed a motion for modification pursuant to section 388 seeking the return of her children on a trial basis. On September 26, 1991, after hearing testimony from appellant regarding her then current circumstances, the court summarily denied her motion for modification.

The court then went on to conduct the contested selection and implementation (§ 366.26) hearing. At the conclusion of this hearing the court found, by clear and convincing evidence, that the minors were adoptable. As a result, the court terminated appellant's parental rights as to both minors.

This appeal timely followed. On appeal, appellant presents the following claims: (1) the trial court erred in not granting her motion for modification; (2) insufficiency of the evidence regarding the suitability of the prospective adoptive parents; (3) the trial court erred because it failed to consider the views of the older child, Leo M., on termination of parental rights and adoption; (4) the trial court erred in not appointing counsel for the minors; and (5) the trial court erred when it failed to make an express finding as to whether the minors would have benefited from continuing the relationship with appellant. The published portion of this opinion addresses appellant's claim of error regarding the trial court considering the views of Leo M. In the unpublished portion of this opinion we reject the remaining claims and therefore affirm the juvenile court's decisions denying appellant's motion for modification, terminating her parental rights, and selecting adoption as the permanent plan.

## FACTS

The minor, Angel G., came to the attention of the Bakersfield Police Department on December 4, 1989, at approximately 9:20 p.m., when personnel of San Joaquin Hospital contacted them regarding a potential case of child neglect. The responding officer contacted the child's treating physician who stated that an unidentified woman had brought Angel to the hospital and advised the staff that the child was having difficulty breathing. The doctor's physical examination of Angel revealed that she was suffering from pneumonia as well as an ear infection but was otherwise in reasonably good condition. The doctor informed the officer that, in his opinion, the child should have received medical treatment long before the time she actually received such care.

The investigating officer then contacted relatives of the minor who were present at the hospital. They told the officer that the minor's paternal aunt had informed them that she had taken Angel to the hospital. These relatives said they had tried, unsuccessfully, to locate Angel's parents. They also informed the officer that her parents would frequently leave a second child, Leo M., with them for as long as a week even though the parents' original intention was to be gone only a day.

The officer later learned that Joey G., Angel's father, and appellant could be contacted at Kern Medical Center.[3] The officer went to the hospital only to find that the parents had left after learning of Angel's admittance.

When the officer was finally able to contact appellant by telephone, she told the officer that she "knew [her] baby was sick, but the line was too long

---

[3]Angel was transferred to this facility because she continued to need medical attention and her parents could not be located.

at the hospital earlier in the day so [she] left [her] baby with [her] sister and went shopping." The officer asked appellant when she intended to take Angel to the hospital and appellant responded later that same day (note the original call came in around 9:20 p.m.). The officer then informed appellant that he was taking Angel into protective custody.

The following day, an investigating social worker spoke with appellant by telephone. On this occasion, appellant said that she left Angel with a friend, whom she identified only as "Gloria," because Gloria had a six o'clock appointment at the health department clinic. She told the social worker that she believed that Gloria was responsible for asking appellant's sister-in-law to care for Angel. Appellant said that shortly after she returned home from shopping, she learned that a friend had an "emergency" and needed her help. The "emergency," according to appellant, was that her friend's father needed a ride home from work.

Appellant told the social worker that she first learned of Angel's hospitalization upon her arrival at her friend's house. She then responded to Kern Medical Center and spoke with the treating physician. According to the treating physician, appellant left the hospital once Angel was admitted.

The social worker asked appellant when she planned on taking Angel to the hospital. Appellant responded that, even though she was aware of Angel's illness, Angel was not running a fever and she (appellant) "had things to do."

The social worker then asked appellant to bring Leo to the department of social services office so that he could be seen. Appellant agreed to do so and arrived later that same day.

During this meeting, appellant told the social worker that she had separated from Leo's father, Emilio M., approximately two and one-half years earlier. She also indicated that he was presently incarcerated in the Kern County Sheriff's facility in Lerdo.

Appellant identified Joey G. as the father of Angel and indicated that, to her knowledge, he had no permanent address. Appellant said that Mr. G. does not use illicit drugs, but does drink alcohol.

When asked whether she used drugs, appellant said that she had not done so for more than five and one-half months. Appellant admitted that, prior to that time, she was injecting heroin intravenously approximately twice per week using shared needles. She claimed to have been tested for HIV antibodies five and one-half months earlier with negative results.

When asked about her family history, appellant indicated that she never knew her mother and that her father was a career criminal. She was a victim of continuous physical abuse at the hands of her stepmother and had been sexually abused by others on two separate occasions as a child.

Approximately two weeks after this meeting, on December 20, 1989, members of the Bakersfield Police Department went to appellant's residence with a search warrant. Upon executing the warrant, the officers discovered appellant and five other people in the home. All but one of these individuals was found to be under the influence of phencyclidine (PCP). Appellant led the officers to her freezer where they discovered PCP. According to the report of the social worker, appellant freely confessed her ownership interest in the drugs and said that being "in the business of selling PCP" allowed her to pay her bills. Appellant was arrested on suspicion of possessing PCP for sale and inducing minors to violate the Health and Safety Code.

When the investigating social worker contacted Leo's father, Mr. M., on December 26, 1989, he told the social worker that appellant was a chronic drug abuser who "*uses*" heroin, cocaine, and methamphetamine.

The record shows that appellant's first encounter with the criminal justice system came when she was 14 years of age and was declared a ward of the court for sniffing paint. Appellant became a ward of the court again after being found to be in possession of stolen property.

The record also reveals that appellant has undergone two psychological evaluations. She was first examined in 1987 and diagnosed as suffering from schizoid personality disorder. During this evaluation, appellant admitted that she had a history of psychiatric hospitalizations and had participated in intermittent psychotherapy when she was younger.

Appellant was evaluated again in November 1989, and categorized as passive, dependent and antisocial. Her diagnosis was listed as "psychoactive substance abuse NOS, post traumatic stress disorder, and personality disorder NOS."

The social worker also learned, from a separate source, that appellant was no stranger to dependency proceedings in that two petitions had been previously filed against her in San Bernardino County Juvenile Court in March of 1987. These petitions alleged that on or about March 11, 1987, and on numerous prior occasions, appellant physically abused Leo and his sibling Bambi V. The petition concerning Bambi also contained allegations that Mr. M. had touched the minor's genital area using "a stick." Appellant

and Mr. M. left San Bernardino County without the court's knowledge or permission after the children had been adjudged dependents of the court. The matter was ultimately transferred to Kern County and, on September 20, 1988, the proceedings involving Leo were dismissed. Appellant's parental rights in Bambi were terminated due to her failed reunification attempts and continued abuse of narcotics.

The social worker also learned of a referral in June of 1989 that resulted from child protective services having obtained information from a mandated reporting party that Angel G. was born with a positive drug screen for methamphetamine and that Angel had a sibling in foster care. The case records related to this referral show that appellant admitted to "heavy drug usage over the last three years after she lost custody of her other two children." The social worker and appellant entered into a family maintenance agreement. However, after only one contact with the family maintenance social worker, appellant moved and made no attempt to reestablish contact. Consequently, services were terminated on September 20, 1989.

A third referral was made regarding appellant on September 25, 1989. However, subsequent investigation proved the allegations to be false.

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### III

*Consideration by the Court of the Child's Wishes*

Appellant claims the juvenile court failed to consider the wishes of Leo M., then five years of age, prior to terminating appellant's parental rights. She relies on section 366.26, subdivision (g), and the decertified opinion *In re Tabetha* (Cal.App.) to argue that direct expression of a minor's wishes is required before parental rights can be extinguished. According to appellant, this case lacks such evidence and must, therefore, be reversed and remanded with directions to ascertain Leo's wishes.

Section 366.26, subdivision (g), provides:

*See footnote, *ante*, page 1583.

"At all termination proceedings, the court shall consider the wishes of the child and shall act in the best interests of the child.

"The testimony of the minor may be taken in chambers and outside the presence of the minor's parent or parents if the minor's parent or parents are represented by counsel, the counsel is present and any of the following circumstances exist:

"(1) The court determines that testimony in chambers is necessary to ensure truthful testimony.

"(2) The minor is likely to be intimidated by a formal courtroom setting.

"(3) The minor is afraid to testify in front of his or her parent or parents.

"After testimony in chambers, the parent or parents of the minor may elect to have the court reporter read back the testimony or have the testimony summarized by counsel for the parent or parents. . . ."

We interpret this statute as imposing a mandatory duty on the courts to "consider the child's wishes to the extent ascertainable" prior to entering an order terminating parental rights under section 366.26, subdivision (c). (*In re Juan H.* (1992) 11 Cal.App.4th 169, 173 [13 Cal.Rptr.2d 716].) Contrary to the assertions made by counsel for the minors, this statement "may take the form of direct formal testimony in court; informal direct communication with the court in chambers, on or off the record; reports prepared for the hearing; letters; telephone calls to the court; or electronic recordings."[6] (*In re Diana G., supra,* 10 Cal.App.4th at p. 1480.) :

Assuming the minor is capable of expressing his/her wishes, we must next determine the content of expression needed to satisfy section 366.26, subdivision (g). The statute, by its own terms, suggests that in a termination action, the minor's feelings regarding the minor's preferences must be explored. The First District Court of Appeal has held that this statute "require[s] the juvenile court to receive direct evidence of the children's wishes regarding termination and adoption at the permanency planning hearing," and "[a]lthough a child's presence in court is not required, an

---

[6]Counsel for the minors claims section 366.26, subdivision (g) requires that the minors' feelings regarding termination be presented through their testimony during the termination hearing. We find no such command in the language of section 366.26, subdivision (g). Indeed, this court previously considered and expressly rejected this position. (*In re Juan H., supra,* 11 Cal.App.4th at pp. 172-173; *In re Jesse B.* (1992) 8 Cal.App.4th 845, 852-853 [10 Cal.Rptr.2d 516]; see also *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1480 [13 Cal.Rptr.2d 645].)

out-of-court statement, as in a report or other form, must reflect the fact that the child is aware that the proceeding involves the termination of parental rights." (*Diana G., supra*, 10 Cal.App.4th at p. 1480.)

As we shall explain, we respectfully disagree with *Diana G.* in this regard. We believe that imposition of such a requirement in all termination proceedings fails to take into account the tremendous diversity that exists among children.

The Evidence Code provides, ". . . 'direct evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (Evid. Code, § 410.) Thus, *Diana G.* would require a direct expression of the minor's wishes with respect to a termination proceeding. We see no requirement in section 366.26, subdivision (g) that evidence indicating the child's wishes be direct or that the child be aware that the proceeding is a termination action for purposes of assessing the child's preferences. While a direct statement of a minor's feelings regarding termination is certainly the most dispositive of the minor's wishes, it will not always be possible or in the minor's best interest to obtain such a statement. For example, some children are simply too young or too immature to understand the concept of termination of parental rights, let alone express their feelings about such a prospect, while others may be permanently and severely traumatized if asked to grapple with the possibility of severing all ties to their biological parents.

The process must be sufficiently flexible to provide some accommodation to the varying circumstances that will inevitably present themselves. Therefore, we believe the decision in a termination action whether to require a direct statement from the minor regarding his/her thoughts is one that is best left to the sound discretion of the trial judge.

In the event the trial court determines that it is not appropriate to obtain such a statement, it may still be possible to explore the minor's feelings regarding his/her biological parents, foster parents, and prospective adoptive parents, if any, as well as his/her current living arrangements. Where practicable and consistent with the best interests of the minor, an attempt should be made to obtain this information so that the court will have before it some evidence of the minor's feelings from which it can then infer his/her wishes regarding the issue confronting the court.

The purpose of the statutory injunction that the court "consider the wishes of the child" simply requires the court to consider what the child's preferences are. It is a reminder to all, but particularly those weighted with the

decisionmaking responsibility, that the child is not a cipher in the process. While we are both statutorily mandated and morally constrained to act in the best interests of the child, to the extent possible children should have some voice. It is, after all, their futures we decide, their destinies we begin and their entire lives we affect. But in honoring their human dignity we must be mindful that we should not carelessly impose upon them decisions which are heavy burdens even for those given the ultimate responsibility to decide. To ask children with whom they prefer to live or to ascertain what they wish through other evidence is one thing. To ask those children to choose whether they ever see their natural parent again or to give voice to approving that termination is a significantly different prospect. We must have regard for the possible and readily conceivable anguish that such confrontational choices could create in a short lifetime already filled with trauma. We see nothing to be gained by mandating such a specific requirement and we see no statutory language compelling that it be inferred. Therefore, we conclude that in considering the child's expression of preferences, it is not required that the child specifically understand the proceeding is in the nature of a termination of parental rights.

 In the present case, no direct evidence of Leo's specific preferences was presented. Nor was any attempt made by the court to interview the minor to learn of his feelings towards appellant, his prospective adoptive parents (who also happen to be his foster parents), or his thoughts on living with his prospective adoptive parents on a permanent basis. While, at age five, Leo may have had difficulty with such concepts, the record is devoid of any evidence showing him incapable of commenting on his relationships with the involved parties. However, while the record contains no direct evidence of Leo's thoughts on this matter, it does include ample evidence from which his feelings can be inferred.

Leo has lived with his foster parents since January 19, 1990. According to the adoptions worker assigned to this case, Leo appeared to have formed a substantial bond with his foster parents. Indeed, the adoption worker went so far as to say that the present foster parents are "the only parents that [Leo] can recall."

The only physical contact the minor had with his mother (appellant) during the entire reunification period was during a December 14, 1990, visit. It was "reported" by an unidentified source that Leo did not recognize his mother or, in any other way, acknowledge her as his mother. Appellant admitted to this state of affairs when she testified during the section 388 hearing which was held immediately before the section 366.26 permanency planning hearing.

Accordingly, even though Leo did not directly express his wishes, it is a reasonable and compelling inference on this evidence that Leo would prefer to live with the only mother and father he has acknowledged. Further, there is nothing before us to support the conclusion that not taking direct evidence of Leo's wishes was an abuse of discretion or was prejudicial under the circumstances of this case. Therefore, we find sufficient evidence here to conclude the court could reasonably ascertain the wishes of Leo. In the absence of evidence to the contrary, we presume the court performed its statutory obligation (Evid. Code, § 664) on behalf of the child.

IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Best, P. J., and Martin, J., concurred.

---

*See footnote, *ante*, page 1583.